**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| In re: EARLE D. MUNNS | Case No.: 11-10912-RGM |
| Debtor. | Chapter 7 |
| | |
| BANK OF AMERICA, N.A.<br>100 North Tryon Street<br>Charlotte, North Carolina 28255 | |
| Plaintiff | |
| v. | Adversary No. _____ |
| EARLE D. MUNNS<br>a/k/a EARLE D. MUNNS, JR.<br>10170 Treble Court<br>Rockville, Maryland 20850 | |
| Defendant. | |

**COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT**

Bank of America, N.A. ("Bank of America"), a creditor with a claim against Earle D. Munns a/k/a Earle D. Munns, Jr. (the "Debtor") of over $5 million, by its attorneys, files this Complaint to Determine Dischargeability of Debt pursuant to 11 U.S.C. § 523(a)(2) and Rule 4007 of the Federal Rules of Bankruptcy Procedure and states:

Michael A. Hass (VSB No. 74974)
mahass@ober.com
Ober, Kaler, Grimes & Shriver
A Professional Corporation
1401 H Street, N.W., 5th Floor
Washington, D.C. 20005
(202) 408-8400
(202) 326-5270 facsimile
Counsel for Bank of America, N.A.

## JURISDICTION AND VENUE

1. This Court has jurisdiction to consider and determine this Complaint pursuant to 28 U.S.C. §§ 157 and 1334, 11 U.S.C. § 105 and 11 U.S.C. § 523(a)(2).

2. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

3. Venue is proper pursuant to 28 U.S.C. § 1409(a).

## PARTIES IN INTEREST AND BACKGROUND

4. On February 9, 2011, the Debtor filed a voluntary petition for relief under Chapter 7 of Title 11 of the United States Code.

5. The Debtor was 52.5% owner of AC Technology, Inc. ("AC Tech"), a Virginia corporation with a principal place of business at 22695 Commerce Center Court, Dulles, Virginia 20116. The Debtor served as AC Tech's Chief Executive Officer during all times relevant to this Complaint.

6. The Debtor's business partner, Michael A. Byrd ("Byrd"), owned 42.5% of AC Tech and served as AC Tech's Executive Vice President during all times relevant to this Complaint.

7. The Debtor, Byrd and J. Steven Britt ("Britt") (owner of a 5% interest in AC Tech) acquired AC Tech from Christopher Sands and Arthur J. Sands, Jr. for a purchase price of $5.5 million. Funding for the acquisition came from a loan made by Bank of America more particularly described herein.

8. Bank of America is a national banking association with its principal place of business at 100 North Tryon Street, Charlotte, North Carolina, 28255.

9. On or about June 30, 2008, Bank of America made available to AC Tech and MB Security Corporation (collectively, the "Borrowers") a revolving line of credit facility in the

committed amount of $10,000,000.00 (the "Line of Credit"). The Line of Credit was made available to the Borrowers pursuant to the terms and conditions of a Credit and Security Agreement dated as of June 30, 2008 (the "Credit Agreement") by and among the Borrowers and Bank of America. A true and accurate copy of the Credit Agreement is attached hereto as Exhibit A and is incorporated by reference herein.

10. The Borrowers' obligation to repay advances under the Line of Credit is evidenced by a Revolving Loan Note dated June 30, 2008 (the "Note") in the original principal amount of $25,000,000.00 payable by the Borrowers to the order of Bank of America. A true and accurate copy of the Note is attached hereto as Exhibit B and is incorporated by reference herein.

11. Repayment of amounts owed under the Note is secured by the personal property collateral, including all of AC Tech's accounts receivable and inventory and all proceeds and products thereof, described in the Credit Agreement.

12. Bank of America properly perfected the security interests granted to it under the Credit Agreement by filing a UCC-1 Financing Statement with the Virginia State Corporation Commission, a true and accurate copy of which is attached hereto as Exhibit C and is incorporated by reference herein.

13. Pursuant to the Credit Agreement and all written agreements, instruments and documents executed in connection therewith (collectively, the "Financing Documents"), Bank of America held a duly perfected security interest in and to all property and assets of the Borrowers.

14. The Debtor, Byrd and Britt needed the Line of Credit in order to fund their acquisition of AC Tech.

15. As a material inducement for Bank of America to make the Line of Credit available to the Borrowers, the Debtor and Byrd unconditionally guaranteed full repayment of all amounts owed by the Borrowers to Bank of America pursuant to the terms of certain Continuing and Unconditional Guaranties dated June 30, 2008. A true and accurate copy of the Continuing and Unconditional Guaranty dated June 30, 2008 given by the Debtor (the "Munns Guaranty") is attached hereto as Exhibit D and is incorporated by reference herein.

16. AC Tech's right and ability to request advances under the Line of Credit was at all times governed by a "Borrowing Base," as defined in the Credit Agreement. The Borrowing Base is calculated based on a formula set forth in the Credit Agreement and is designed to ensure that Bank of America would not intentionally lend to AC Tech more money than was adequately secured by "eligible" collateral.

17. The Borrowing Base was defined in the Credit Agreement as:

> an amount equal to the sum of (a) ninety percent (90%) of Eligible Government Accounts, plus (b) eighty percent (80%) of Eligible Commercial Accounts, plus (c) fifty percent (50%) of Eligible Unbilled Accounts, minus (d) such reserves as Lender may from time to time establish in good faith on the basis of its Field Exams and otherwise.

(*See* Ex. A, Credit Agreement at § 1).

18. A key component of the Borrowing Base calculation is whether certain accounts receivable of AC Tech were "Eligible Accounts," as that term is defined in Section 1 of the Credit Agreement.

19. In order to be an "Eligible Account," a particular account must "represent a legal, valid and binding payment obligation of the Account Debtor enforceable in accordance with its terms and arising from an enforceable contract." *See id.* (defining "Eligible Account"). In addition, in order to be an "Eligible Account," AC Tech must "have good and indefeasible title to

such Account and the Lender [must hold] a perfected first priority Lien on such Account pursuant to the Financing Documents." *Id.*

20. The Credit Agreement contains the written representation by AC Tech that, as of the date of the Credit Agreement and as of the date of each advance under the Line of Credit, each "Account" meets certain very specific requirements, most salient in this case the representation that, with respect to each Account, "there are no setoffs, claims, or disputes existing or asserted with respect thereto." *See id.* at § 3.17.

21. Compliance with the Borrowing Base is periodically reported to Bank of America in a "Borrowing Base Certificate," signed by an authorized officer of AC Tech and delivered to Bank of America. Each Borrowing Base Certificate contains the following certification:

> I certify the above to be true and correct to the best of my knowledge and belief. We understand that you are relying upon this Report and supporting documents in granting credit to us and we warrant that no Event of Default exists or is imminent under any agreements between us. The undersigned further certifies that all inventory is owned by us free and clear of any liens or encumbrances other than to Bank of America, that the same is under the control and in the possession of the undersigned and otherwise, complies with all provisions of agreements between us.

22. Under the terms of the Credit Agreement, AC Tech was required to submit Borrowing Base Certificates to Bank of America within 25 days after the end of each calendar quarter. *Id*. at § 4.2. The parties subsequently agreed to revise this affirmative covenant so that AC Tech was required to deliver Borrowing Base Certificates to Bank of America on a weekly basis, which AC Tech began to do in January, 2009.

23. On Friday, June 27, 2008, prior to closing on their purchase of AC Tech, the Debtor and Byrd received an electronic mail message from Christopher Sands with an A/R report indicating that the total amount of AC Tech's accounts receivable, as of 6:00 p.m. on June 27, 2008, was $4,896,514.65.

24. To obtain the initial advance under the Line of Credit, the Debtor, on behalf of AC Tech, delivered an initial Borrowing Base Certificate (the "Initial Borrowing Base Certificate") to Bank of America on Sunday, June 29, 2008, by electronic mail, a true and accurate copy of which is attached hereto as Exhibit E and is incorporated by reference herein.

25. The Initial Borrowing Base Certificate attached to the Debtor's electronic mail message constituted a written representation that AC Tech's eligible accounts receivable were $9,477,691.98, as of June 27, 2008 (the date of the Initial Borrowing Base Certificate). (*See* Ex. E at Line 9).

26. The Initial Borrowing Base Certificate was prepared based on information provided by, and under the supervision of, the Debtor.

27. The Debtor's June 29, 2008 electronic mail message transmitting the Initial Borrowing Base Certificate to Bank of America stated in part as follows:

> We sent our revised and carefully reviewed BBC on Friday evening as per the email trail below (see attachments). This was later than we planned, but another $2.1 mm was booked Friday and we almost have another $646,700 which we expect tomorrow.
>
> I am resending the email and attachments now after I was apprised today you may not have received the email and attachments Friday.

28. The amount of AC Tech's eligible accounts receivable listed on the Initial Borrowing Base Certificate transmitted to Bank of America by the Debtor on Sunday, June 29, 2008 exceeded the amount of AC Tech's accounts receivable listed on the A/R report provided to the Debtor and Byrd by Christopher Sands on Friday, June 27, 2008 by more than $4.5 million.

29.     The Debtor directed Byrd to list eligible accounts receivable of $9,477,691.98 on the Initial Borrowing Base Certificate, rather than accounts receivable of $4,896,514.65 as set forth in the A/R report provided to the Debtor and Byrd by Christopher Sands.

30.     According to AC Tech's official books and records, AC Tech had gross accounts receivable of only $2,257,850.01 as of the date of the Initial Borrowing Base Certificate, or over $7.1 million less than that which was certified by AC Tech pursuant to the Initial Borrowing Base Certificate transmitted to Bank of America by the Debtor.

31.     By falsifying the accounts receivable information in the Initial Borrowing Base Certificate, the Debtor and Byrd were able to obtain financing from Bank of America necessary to complete the purchase of AC Tech from Christopher Sands and Arthur J. Sands, Jr.

32.     An advance on the Line of Credit in an amount less than the $5,500,000.00 initial advance (the "Initial Advance") made by Bank of America in reliance on representations by the Debtor and Byrd would not have been sufficient to allow the Debtor, Byrd and Britt to complete the purchase of AC Tech from Christopher Sands and Arthur J. Sands, Jr.

33.     Pursuant to Section 3.6 of the Credit Agreement, the Borrowers represented and warranted to Bank of America that, as of June 30, 2008, the collateral security for the Line of Credit was not subject to any liens, security interests or other encumbrances other than those identified in the Credit Agreement.

34.     Section 5.4 of the Credit Agreement prohibited the Borrowers from encumbering any of AC Tech's assets without Bank of America's knowledge and permission.

35.     Despite the prohibition on encumbering AC Tech's assets, the Debtor, through a shell entity created for the purpose of purchasing AC Tech, entered into a credit facility with

Arrow Electronics, Inc. (the "Distributor"), prior to the closing on the Line of Credit, and committed AC Tech to guarantee payments to the Distributor.

36.     According to AC Tech's schedule of "existing indebtedness" attached as Schedule 5.3 to the Credit Agreement and delivered to Bank of America prior to closing, the Distributor was listed as an "account payable" of AC Tech in the total amount of $735.22.

37.     In reliance upon the summary of "existing indebtedness" attached as Schedule 5.3 to the Credit Agreement, the Initial Borrowing Base Certificate and other representations by AC Tech, the Debtor and others, Bank of America made the Initial Advance at the closing on the Line of Credit.

38.     On or about August 18, 2008, less than two months after the Initial Advance, the Distributor delivered to Bank of America a certified letter, a true and accurate copy of which is attached hereto as Exhibit F and incorporated by reference herein, stating that the Distributor intended to take a purchase money security interest in certain of AC Tech's inventory.

39.     The next day, August 19, 2009, counsel to Bank of America delivered an electronic mail message to Britt, counsel for AC Tech, a true and accurate copy of which is attached hereto as Exhibit G and incorporated by reference herein, which stated, in pertinent part:

> The credit agreement permits the $735 existing debt to Arrow Electronics existing as of the date of closing, and if this is all that the attached refers to, please confirm for me and we will be done.
>
> If the attached contemplates more or different indebtedness, or the imposition of a lien against the Bank's collateral (which the text of the letter seems to suggest), then the Borrowers are prohibited from incurring it without the prior written consent of the Lender, which would undoubtedly be conditioned upon Arrow's execution of a comprehensive subordination agreement.

40. More than one month later, on September 19, 2008, Britt replied with an electronic mail message, a true and accurate copy of which is attached hereto as Exhibit H and incorporated by reference herein, which stated in pertinent part:

> As we discussed, the recent MOCA letter was the result of a mistaken execution of a document by AC Technology. We expect to have the underlying purchase order paid off in the next couple of weeks and have taken steps to ensure it doesn't happen again. It resulted from an over-zealous effort to capture some new A/R.

41. Contrary to the written and verbal representations of AC Tech's attorney, Britt, and in direct contravention of certain negative covenants set forth in the Credit Agreement, AC Tech intended to and had incurred significant secured indebtedness to the Distributor.

42. In particular, AC Tech executed a Security Agreement dated as of July 30, 2008 in favor of the Distributor (the "Distributor Security Agreement") and a Limited Power of Attorney of even date therewith that, among other things, purported to authorize the Distributor to endorse checks payable to AC Tech and deposit them in the Distributor's bank account. The Distributor filed a UCC-1 Financing Statement with the Virginia State Corporation Commission covering certain electronic merchandise and other products sold to AC Tech by the Distributor and the accounts receivable and other rights to payment derived from AC Tech's sale of such electronic merchandise and products. True and accurate copies of the Distributor Security Agreement, Limited Power of Attorney and UCC-1 Financing Statement are attached hereto collectively as Exhibit I and are incorporated by reference herein.

43. At all times following the submission of the Initial Borrowing Base Certificate and the closing on the Line of Credit on June 30, 2008, AC Tech and its senior management, including the Debtor, continued to assert in writing that all of AC Tech's "Eligible Government Accounts" were free of the liens, pledges and interests of the Distributor and indeed any other third party.

44. On several occasions in 2008, and on January 25, 2009, February 6, 2009, February 20, 2009, February 27, 2009, March 13, 2009, March 20, 2009 and March 27, 2009, authorized officers of AC Tech, including the Debtor, executed and delivered to Bank of America additional Borrowing Base Certificates, each of which contained the following certification:

> I certify the above to be true and correct to the best of my knowledge and belief. We understand that you are relying upon this Report and supporting documents in granting credit to us and we warrant that no Event of Default exists or is imminent under any agreements between us. The undersigned further certifies that all inventory is owned by us free and clear of any liens or encumbrances other than to Bank of America, that the same is under the control and in the possession of the undersigned and otherwise, complies with all provisions of agreements between us.

A copy of a Borrowing Base Certificate for the month ending August 31, 2008 (the "August Borrowing Base Certificate") signed by the Debtor (and erroneously dated July 31, 2008) is attached as Exhibit J and incorporated by reference herein.

45. The August Borrowing Base Certificate listed AC Tech's total trade accounts receivable, as of August 31, 2008, as $5,973,724.98. Contrary to the written representation of the Debtor, a substantial portion, if not all, of those trade accounts receivable were the subject of the liens, pledges and interests of the Distributor purportedly granted to the Distributor by AC Tech.

46. According to AC Tech's official books and records, and contrary to the written representation of the Debtor, AC Tech had gross accounts receivable of only $1,006,054.34, as of August 31, 2008, or over $4.9 million less than the total accounts receivable certified by the Debtor in the August Borrowing Base Certificate.

47. At all times after AC Tech's execution of the Distributor Security Agreement on July 30, 2008, AC Tech and all of its senior management, including the Debtor, knew that all of

2326122                                    10

AC Tech's so-called Eligible Government Accounts were secretly required to be remitted to a post office box in New Jersey.

48. Upon information and belief, the post office box, despite being labeled in the name of AC Tech, was a bank "lockbox" exclusively controlled by the Distributor.

49. The Debtor knew that all of AC Tech's so-called Eligible Government Accounts had been pledged to the Distributor, in direct contravention of certain negative covenants set forth in the Credit Agreement, and intentionally misled Bank of America in this regard.

50. Bank of America reasonably relied on written and verbal representations made by AC Tech and the Debtor before and after the June 30, 2008 closing on the Line of Credit.

51. Closing on the Line of Credit would not have occurred if the Debtor made accurate written and verbal representations to Bank of America regarding the collateral security for the Line of Credit and the liabilities of AC Tech.

52. As a result of its reliance on such representations, Bank of America has suffered damages, including without limitation the loss of its collateral security for the repayment of advances under the Line of Credit.

53. On December 4, 2008, Bank of America received a Compliance Certificate dated December 2, 2008 (the "Compliance Certificate"), as required by Section 4.2 of the Credit Agreement, with respect to the calendar quarter ending September 30, 2008. A copy of the Compliance Certificate is attached as Exhibit K and incorporated by reference herein.

54. The Compliance Certificate reported that AC Tech was in default on a financial covenant under the Credit Agreement relating to the funded debt to EBITDA ratio (the "Covenant Default") and certified and warranted that no other defaults existed under the Credit Agreement.

55. By letter dated December 17, 2008 (the "Default Letter"), Bank of America notified AC Tech that AC Tech was in default under the Financing Documents for, among other reasons, (i) suffering the Covenant Default and (ii) providing incorrect and materially misleading information to Bank of America with respect to AC Tech's financial condition as of the June 30, 2008 closing on the Line of Credit. A copy of the Default Letter is attached as Exhibit L and incorporated by reference herein.

56. In reliance upon certain Borrowing Base Certificates delivered to Bank of America by AC Tech, among other things, Bank of America agreed to forbear from exercising its remedies under the Financing Documents and applicable law against AC Tech, the Debtor and Byrd pursuant to a Loan Modification Agreement dated as of February 18, 2009 (the "Modification Agreement"). A copy of the Modification Agreement is attached as Exhibit M and is incorporated by reference herein.

57. Following AC Tech's failure to meet the obligations set forth in the Modification Agreement, Bank of America delivered a letter to AC Tech dated March 30, 2009 notifying AC Tech that Bank of America was immediately commencing the enforcement of its rights and remedies under the Financing Documents.

58. Since the June 30, 2008 closing of the Line of Credit transaction, AC Tech has repeatedly failed to honor its affirmative covenants, including its covenant to repay the Borrowing Base Deficiency (as defined in the Credit Agreement), and has repeatedly engaged in conduct prohibited by its negative covenants, to the demonstrable injury of Bank of America.

59. Bank of America has identified numerous transfers and payments by AC Tech and its management in direct contravention of certain negative covenants set forth in the Credit Agreement.

60. The Debtor has diverted proceeds from the Line of Credit and proceeds from the collateral securing repayment of the Line of Credit to his personal account.

61. The Financing Documents are in default and all indebtedness thereunder is immediately due and payable to Bank of America.

62. On April 9, 2009, Bank of America filed its Verified Complaint for Breach of Contract, Fraud and Conversion against AC Tech, the Debtor and Byrd in the United States District Court for the Eastern District of Virginia (the "District Court") commencing Case No. 1:09-cv-00391-GBL-TCB.

63. Pursuant to an Order entered by the District Court granting a motion by AC Tech, the Debtor and Byrd to compel arbitration, Case No. 1:09-cv-00391-GBL-TCB was dismissed and the matter was referred to the American Arbitration Association (AAA Case No. 16 148 Y 00590 09) for a determination of Bank of America's claims against AC Tech, the Debtor and Byrd (the "Arbitration").

64. On February 25, 2010, prior to the conclusion of the Arbitration, Byrd filed a voluntary petition under Chapter 7 of the Bankruptcy Code commencing Case No. 10-13755-TJC in the United States Bankruptcy Court for the District of Maryland (the "Maryland Bankruptcy Court").

65. Bank of America commenced an adversary proceeding in the Maryland Bankruptcy Court (Adv. No. 10-00179) seeking (i) entry of a money judgment on Byrd's guarantee of AC Tech's obligations to Bank of America and (ii) a determination of the dischargeability of Byrd's debt to Bank of America.

66. On April 26, 2010, the Maryland Bankruptcy Court entered a Consent Order (I) Entering Money Judgment, (II) Determining Non-Dischargeability of Debt, and (III) Related

Stipulation Regarding Limit of Enforcement (the "Consent Order") entering a judgment in favor of Bank of America against Byrd in the amount of $4.7 million, plus interest and costs, and determining that Byrd's debt to Bank of America is non-dischargeable pursuant to Section 523(a)(2) of the Bankruptcy Code. A copy of the Consent Order is attached as Exhibit N and is incorporated by reference herein.

67.     Despite entry of an order by the AAA granting a motion filed by Bank of America to compel production of documents in the Arbitration, the Debtor failed to comply with that order.

68.     At the conclusion of the Arbitration, the AAA entered a Final Award of Arbitrator dated October 4, 2010 in favor of Bank of America and against the Debtor and AC Tech, jointly and severally, in the amount of $5,207,124.39, plus interest (the "Award").

69.     Pursuant to a Consent Decree entered by the Circuit Court of Fairfax County on November 30, 2010, the award was confirmed and judgment in favor of Bank of America against the Debtor and AC Tech, jointly and severally, in the amount of $5,207,124.39, plus interest (the "Judgment") was entered. A copy of the Consent Decree is attached as Exhibit O and is incorporated herein by reference.

## Count I: Obtaining Funds Through False Representations (11 U.S.C § 523(a)(2)(A))

70.     Bank of America incorporates by reference herein all of the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

71.     The Debtor has repeatedly made false representations to Bank of America in connection with the Line of Credit.

72. The false representations made by the Debtor involved facts material to the application, establishment, and administration of the Line of Credit, as well as the collateral security for the Line of Credit.

73. The false representations made by the Debtor to Bank of America were at all times made intentionally and knowingly.

74. The false representations made by the Debtor were intended to mislead Bank of America.

75. Bank of America at all times reasonably relied upon the false representations made by the Debtor to Bank of America.

76. Advances under the Line of Credit by Bank of America were induced by false representations made by the Debtor.

77. Closing on the Line of Credit and funding of the Initial Advance would not have occurred if the Debtor made accurate representations to Bank of America regarding, among other things, the collateral security for the Line of Credit.

78. The proceeds from the Line of Credit were obtained through false representations within the meaning of 11 U.S.C. § 523(a)(2)(A).

79. The Debtor's indebtedness to Bank of America resulting from the advances under the Line of Credit is excepted from discharge pursuant to 11 U.S.C. § 523(a)(2)(A).

WHEREFORE, Plaintiff Bank of America, N.A. respectfully prays for entry of judgment in its favor against Earle D. Munns a/k/a Earle D. Munns, Jr. for the following relief:

(i) determining that the indebtedness of Earle D. Munns a/k/a Earle D. Munns, Jr. to Bank of America, N.A. under the Judgment in the amount of $5,207,124.39, plus interest, be

excepted from discharge pursuant to Section 523(a)(2)(A) of Title 11 of the United States Code; and

(ii)     granting Bank of America, N.A. such other and further relief as this Court deems just and equitable.

### Count II:  Obtaining Funds Through False Statements Respecting the Debtor's or an Insider's Financial Condition (11 U.S.C § 523(a)(2)(B))

80.     Bank of America incorporates by reference herein all of the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

81.     By executing the Credit Agreement on behalf of AC Tech, the Debtor expressly represented and warranted to Bank of America that the Initial Borrowing Base Certificate did not contain any misstatement of material fact or omit to state a material fact or any fact necessary to make the Initial Borrowing Base Certificate not misleading.

82.     The Debtor, by delivering the Initial Borrowing Base Certificate to Bank of America, represented to Bank of America in writing that AC Tech's eligible accounts receivable, as of the Date of the Initial Borrowing Base Certificate, were $9,477,691.98.

83.     The Debtor's written representation with respect to AC Tech's gross accounts receivable was materially false when the Initial Borrowing Base Certificate was delivered to Bank of America.

84.     AC Tech was an "insider" with respect to the Debtor pursuant to 11 U.S.C. § 101(31).

85.     The Debtor's false statement regarding AC Tech's gross accounts receivable was a statement respecting the Debtor's or an insider's financial condition.

86. Bank of America reasonably relied on the Debtor's statement concerning AC Tech's gross accounts receivable when it closed on the Line of Credit on June 30, 2008 and funded the Initial Advance.

87. Bank of America would not have closed on the Line of Credit or funded the Initial Advance if the Debtor disclosed the actual amount of AC Tech's gross accounts receivable.

88. The Debtor caused the false representation in the Initial Borrowing Base Certificate to be made with the intent to deceive Bank of America with respect to AC Tech's financial condition and to induce Bank of America to make the Line of Credit available to AC Tech and to fund the Initial Advance.

89. As a result of certain obligations the Debtor caused AC Tech to incur prior to closing on the Line of Credit, representations and warranties contained in the Credit Agreement, which was executed by the Debtor on behalf of AC Tech, respecting AC Tech's financial condition were false.

90. Bank of America reasonably relied on the representations and warranties in the Credit Agreement when it closed on the Line of Credit on June 30, 2008 and funded the Initial Advance.

91. Bank of America would not have closed on the Line of Credit or funded the Initial Advance if AC Tech made accurate representations respecting its financial condition in the Credit Agreement.

92. Pursuant to the August Borrowing Base Certificate, the Debtor made the following representations to Bank of America:

(a) AC Tech's gross accounts receivable, as of the date of the July Borrowing Base Certificate, were $5,975,046.77;

  (b)  no Event of Default existed or was imminent under the Financing Documents; and

  (c)  AC Tech's inventory was owned by AC Tech free and clear of any liens or encumbrances other than liens of Bank of America.

93. Each of the foregoing representations contained in the August Borrowing Base Certificate respected the Debtor's or an insider's financial condition and was materially false when made in writing by the Debtor.

94. Bank of America reasonably relied on the Debtor's statements in the August Borrowing Base Certificate in continuing to make the Line of Credit available to AC Tech.

95. Bank of America would have immediately exercised its rights and remedies under the Financing Documents if the Debtor had disclosed (i) the actual amount of AC Tech's accounts receivable as of the date of the August Borrowing Base Certificate, (ii) the defaults under the Credit Agreement that existed as of the date of the August Borrowing Base Certificate or (iii) the existence of the Distributor Security Agreement and the Distributor's lien on AC Tech's inventory.

96. The Debtor caused the false representations in the August Borrowing Base Certificate to be made with the intent to deceive Bank of America with respect to AC Tech's financial condition and to induce Bank of America to continue to make the Line of Credit available to AC Tech.

97. The Debtor has received direct and indirect benefit from Bank of America's advances under the Line of Credit.

98. The indebtedness of the Debtor to Bank of America under the Judgment is a debt for credit obtained by use of materially false written statements respecting the Debtor's or an insider's financial condition within the meaning of 11 U.S.C § 523(a)(2)(B).

99. The Debtor's indebtedness under the Judgment is excepted from discharge pursuant to 11 U.S.C § 523(a)(2)(B).

WHEREFORE, Plaintiff Bank of America, N.A. respectfully prays for entry of judgment in its favor against Earle D. Munns a/k/a Earle D. Munns, Jr. for the following relief:

(i) determining that the indebtedness of Earle D. Munns a/k/a Earle D. Munns, Jr. to Bank of America, N.A. under the Judgment in the amount of $5,207,124.39, plus interest, be excepted from discharge pursuant to Section 523(a)(2)(B) of Title 11 of the United States Code; and

(ii) granting Bank of America, N.A. such other and further relief as this Court deems just and equitable.

Bank of America, N.A., a national banking association,

By: /s/ Michael A. Hass
      Counsel

Michael A. Hass (VSB No. 74974)
mahass@ober.com
Ober, Kaler, Grimes & Shriver
A Professional Corporation
1401 H Street, N.W., 5th Floor
Washington, D.C. 20005
(202) 408-8400
(202) 326-5270 facsimile
*Of Counsel:*

E. John Steren
ejsteren@ober.com
Walter R. Kirkman
wrkirkman@ober.com
Ober, Kaler, Grimes & Shriver
A Professional Corporation
1401 H Street, N.W., 5th Floor
Washington, D.C. 20005
(202) 408-8400
(202) 408-0640 facsimile

2326122